IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

EQUAL EMPLOYMENT OPPORTUNITY      )
COMMISSION,                       )
                                  )
          Plaintiff,              )          CIVIL ACTION NO.
                                  )
     v.                           )
                                  )
DURA AUTOMOTIVE SYSTEMS, INC.     )          COMPLAINT
                                  )
                                  )
          Defendant.              )          JURY TRIAL DEMAND
                                  )

## NATURE OF THE ACTION

This is an action under Title I of the Americans with Disabilities Act of 1990 and

Title I of the Civil Rights Act of 1991 to correct employment practices made unlawful by

the Americans with Disabilities Act and to provide appropriate relief to Johnny Gardner,

Charles Rawdon, Annie Corbin, Susan Lowery, Edie Cox, Branson Walker, and a class

of other former and current employees who were adversely affected by those unlawful

practices. As alleged with greater particularity below, Plaintiff Equal Employment

Opportunity Commission ("the Commission") alleges that Defendant Dura Automotive

Systems, Inc. committed unlawful employment practices in violation of the ADA by

conducting illegal medical examinations and making illegal medical inquiries of its

employees, using selection criteria to screen out persons with disabilities, failing to

maintain the confidentiality of information it obtained from medical examinations that it

conducted on current employees, and by using information it obtained through medical

inquiries and examinations in a manner not in accordance with the ADA in taking

adverse employment actions against more than 30 employees who tested positive for legally prescribed narcotic medication. The Commission alleges that as a result of Defendant's actions, current and former employees, including but not limited to Susan Lowery, Annie Corbin, Branson Walker, Edie Cox, Johnny Gardner, and Charlene Rawdon, and a class of other employees, suffered financial losses and serious mental and emotional injuries as a result of Defendant's actions in violation of the ADA.

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Section 107(a) of the ADA, 42 U.S.C. § 12117(A), which incorporates by reference Sections 706(f)(1) and (3) and 707 of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-5(f)(1) and (3), and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2. The employment practices alleged to be unlawful were and are now being committed within the jurisdiction of the United States District Court for the Middle District of Tennessee, Nashville Division.

## PARTIES

3. Plaintiff, the Equal Employment Opportunity Commission (the Commission), is the agency of the United States of America charged with the administration, interpretation, and enforcement of Title I of the ADA and is expressly authorized to bring this action by Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference Section 706(f)(1) and (3) of Title VII, 42 U.S.C. §2000e-5(f)(1) and (3).

2

4. At all relevant times, Defendant Dura Automotive Systems, Inc. ("Dura Automotive") has continuously conducted business in the State of Tennessee and the City of Lawrenceburg. Defendant Employer has continuously had at least fifteen employees.

5. At all relevant times, Defendant Employer has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 101(5) of the ADA, 42 U.S.C. § 1211(7), which incorporates by reference Sections 701 (g) and (h) of Title VII, 42 U.S.C. §§ 2000e (g) and (h).

6. At all relevant times, Defendant Employer has been a covered entity within the meaning of Section 101(2) of the ADA, 42 U.S.C. § 12111(2.

## STATEMENT OF CLAIMS

7. More than thirty days prior to the institution of this lawsuit, Susan Lowery, Annie Corbin, Branson Walker, Edie Cox, Johnny Gardner, and Charlene Rawdon filed charges of discrimination alleging violations of the ADA by Defendant Employer. All conditions precedent to the institution of this lawsuit have been fulfilled.

8. Since at least approximately April, 2007, Defendant Employer has engaged in unlawful employment practices in violation of Section 102 of the ADA, 42 U.S.C. Section 12112.

9. The unlawful employment practices involved subjecting all of its employees to tests for legally prescribed medications for which Defendant was not authorized to test by any statute and doing so without reasonable suspicion that such medications were affecting these employees in the performance of their jobs. The

3

unlawful employment practices further involved suspending in excess of thirty employees who tested positive for certain legally prescribed medications, requiring those employees to disclose the medical conditions for which they were prescribed the medications, requiring them to cease taking the prescribed medications as a condition of being returned to work, terminating those employees who were unable to work without the benefit of their prescribed medications, the medical screening operated to screen out individuals with disabilities, and Defendant failed to maintain confidentiality of the results of the tests.

10.     Defendant implemented and applied an employment policy that is not job related or consistent with business necessity, and that prevents persons who are taking legally prescribed narcotic medications from working for Defendant. The policy, as applied by Defendant to Johnny Gardner, Charles Rawdon, Annie Corbin, Susan Lowery, Edie Cox, Branson Walker and a class of other former and current employees of Defendant, denied employment opportunities to the employees who take, or were at the relevant time taking, legally prescribed narcotic medication in violation of the ADA.

11.     The unlawful employment practices included subjecting Annie Corbin to medical examinations and inquiries that violated the ADA and using the information obtained therefrom in a manner not in accordance with the ADA.

a.     Approximately 22 years ago, Ms. Corbin became employed with Defendant as a production worker.

b.     During 20+ years of employment with Defendant, Ms. Corbin developed certain medical conditions for which she was prescribed certain medications by her treating physicians. She continued to perform her job duties while taking these

4

medications without them adversely affecting her performance in any way.

    c.     In November, 2006, Ms. Corbin injured her foot while working for Defendant and was placed by Defendant on a workers' compensation leave of absence.

    d.     In April, 2007, Defendant decided to implement a drug free workplace program pursuant to the Tennessee Drug Free Workplace Program statute, T.C.A. Section 0-9-101 *et seq.* In conjunction with implementing this program, Defendant decided to test all of its production employees. T.C.A. Section 0-9-101 *et seq.* incorporates by reference D.O.T. regulations found at 49 CFR § 40.85 authorizing employers to test for the five classes of illegal drugs. In addition to testing for the five classes of illegal drugs described in the D.O.T. regulations, however, Defendant decided on its own initiative to test for seven other classes of drugs for which Defendant was not authorized to test by any state or federal statute. These seven classes of drugs all are legal to take when taken pursuant to legally written prescriptions, and the D.O.T. regulations state: "If a positive result occurs that is due to a legally prescribed medicine, a DOT testing laboratory is required to report the result to the employer as 'negative.'" 49 CFR § 40.85.

Defendant made the decision to test all of its production employees for all of these drugs without regard for whether Defendant had any cause to suspect that particular employees were using drugs or that use of drugs were adversely affecting their job performances. Defendant then, without conducting an individualized assessment of the effect of these drugs on particular employees' abilities to perform their job duties, required all employees who tested positive for any of these seven classes of legal drugs to stop taking the drugs for which they had tested positive as a

5

condition of their returning to work

     e.     Ms. Corbin was still on workers' compensation leave of absence in May, 2007, when Defendant told her to go to the facility of a contractor that Defendant had retained for the purpose of conducting the drug tests of Defendant's employees. Defendant told Ms. Corbin to bring with her all medications that she was taking. Ms. Corbin went to the contractor's facility with her medications as Defendant had instructed her to do. The contractor inquired of her as to the medical condition for which she was taking each such medication.

     f.     Ms. Corbin provided a urine sample to a nurse employed by the contractor. The nurse told her that she had tested positive for certain chemicals.

     g.     Defendant continued Ms. Corbin's workers' compensation leave of absence, but advised her that she would not be allowed to return to work until she stopped taking her medications and tested negative on another drug screen. Defendant did not make an individualized assessment of the effect of Ms. Corbin's medications upon her ability to perform her job duties, but rather inflexibly applied a blanket policy to all of its employees who tested positive that they had to stop taking

     h.     Ms. Corbin stopped taking her medications, tested negative on a drug screen, and was allowed by Defendant to return to work on or about July 16, 2007. Without the benefit of her prescription medications, Ms. Corbin experienced excruciating pain while performing her assigned job duties.

     i.     On August 1, 2007, Defendant advised Ms. Corbin that it would no longer have any work for her due to medical restrictions that her treating physicians had placed on her. Defendant previously had allowed Ms. Corbin to work for years with these same

6

medical restrictions.

j.      On or about August 9, 2007, Defendant advised Ms. Corbin that it had terminated her employment.

k.      Defendant and Ms. Corbin subsequently agreed upon a workers' compensation settlement for the injury to her foot.

l.      Defendant's medical examination, medical inquiries, and use of the information obtained from the examination and inquiries to suspend Ms. Corbin and condition her return to work upon her ceasing to take her prescription medication without conducting an individual assessment of her ability to perform her job duties caused Ms. Corbin severe mental and emotional injuries and financial losses, including lost income.

m.      The effect of the practices complained of in paragraphs 11a-l above has been to deprive Annie Corbin of equal employment opportunities and to otherwise adversely affect her status as an employee in violation of the ADA.

12.      The unlawful employment practices included subjecting Johnny Gardner to medical examinations and inquiries that violated the ADA, failing to maintain confidentiality of information Defendant obtained from the medical examinations, and using the information obtained from these medical examinations and inquiries in a manner not in accordance with the ADA.

a.      Mr. Gardner became employed with Defendant as a production worker in 1990. After approximately two years he became the lead person in the repair department. Approximately ten years later, he became a lab technician.

b.      Beginning in 2000, Mr. Gardner was prescribed certain medications by his

7

treating physician for certain medical conditions.

c.    On or about May 7, 2007, Mr. Gardner arrived at work and was required by Defendant to submit to a drug test as described in ¶ 11d above. At that time Defendant had no cause to suspect that use of drugs was adversely affecting Mr. Gardner's job performance.

d.    Mr. Gardner followed Defendant's instructions to report to a common area where numerous other employees were waiting to be tested and gave a urine sample to a nurse employed by the contractor hired by Defendant to conduct Defendant's drug testing.

e.    Mr. Gardner waited in the common area with numerous other employees until the test was complete. The nurse who tested Mr. Gardner publicly announced in front of all employees in the area that Mr. Gardner's urine sample had tested positive for the presence of certain chemicals.

f.    Defendant then instructed Mr. Gardner to go to a smaller room nearby and wait with a group of other employees whose urine samples also had tested positive for certain chemicals. Employees whose urine had tested negative for any of the chemicals for which Defendant was testing were instructed by Defendant to return to their work stations. Every employee in Defendant's factory thus was made aware of which employees had tested positive and which had tested negative.

g.    Defendant met privately with Mr. Gardner and asked him what medications he was taking and for what medical conditions he was taking each of them. Defendant then sent him home and instructed him to bring his medications to its drug testing contractor along with proof that each of those medications had been prescribed

8

for him.

h. The following day, Mr. Gardner brought his prescription medications and proof that he had a prescription for each of them to the contractor. After seeing the proof that Mr. Gardner had prescriptions for these medications, the contractor reported to Defendant that the results of Mr. Gardner's drug test were negative.

i. Despite the contractor's report of a negative result on Mr. Gardner's drug test, Defendant did not allow him to return to work. Rather, Defendant placed him on unpaid leave of absence.

j. Without conducting an individualized assessment of the effect of Mr. Gardner's prescription medications on his ability to perform his job duties, Defendant advised Mr. Gardner that he would have to stop taking his medications and test negative on another drug screen to return to work. Mr. Gardner stopped taking his prescription medications and, on June 21, 2007, tested negative on a drug screen. Defendant allowed him to return to work at that time. Defendant removed Mr. Gardner from his lab technician job, however, and reassigned him to production jobs that were more physically strenuous.

k. Without the benefit of his prescription medications, Mr. Gardner experienced severe pain while performing these physically strenuous jobs, which caused him to have to take sick days much more frequently than he had previously during his employment with Defendant.

l. Defendant's medical examination, medical inquiries, disclosure of the results of the medical examination to Mr. Gardner's co-workers, and use of the information obtained from the examination and inquiries to suspend Mr. Gardner and

9

condition his return to work upon his ceasing to take his prescription medications caused Mr. Gardner severe mental and emotional injuries and financial losses, including lost income.

m.     The effect of the practices complained of in paragraphs 12a-l above has been to deprive Johnny Gardner of equal employment opportunities and to otherwise adversely affect his status as an employee in violation of the ADA.

13.     The unlawful employment practices included subjecting Susan Lowery to medical examinations and inquiries that violated the ADA, failing to maintain confidentiality of information Defendant obtained from the medical examinations, and using the information obtained from these medical examinations and inquiries in a manner not in accordance with the ADA.

a.     Charging Party Lowery became employed with Defendant in 1985 as a production worker. After eight years, she was promoted to a quality control position and shortly after that to a production supervisor position. At no time during her employment did Defendant advise her that there was any problem with her performance.

b.     Ms. Lowery was prescribed certain medications for certain medical conditions in 2003.

c.     As a supervisor, Ms. Lowery attended training put on by Defendant in 2007 regarding the drug testing Defendant intended to conduct. During that training, Defendant stated that the drug tests were intended to detect only illegal drug usage. Defendant said during the training that it would take no action against employees who were taking medications for which they had prescriptions,

d.     On or about May 8, 2007, Ms. Lowery arrived at work and was required by

10

Defendant to submit to a drug test as described in ¶ 11d. above despite Defendant's having no cause to suspect that use of drugs was adversely affecting Ms. Lowery's job performance.

    e.    Ms. Lowery followed Defendant's instructions to report to a common area where numerous other employees were waiting to be tested and gave a urine sample to a nurse who was conducting drug testing for Defendant.

    f.    Ms. Lowery waited in the common area with numerous other employees until the test was complete. The nurse who tested Ms. Lowery publicly announced in front of all employees in the area that Ms. Lowery's urine sample had tested positive for the presence of certain chemicals. Ms. Lowery was one of approximately 30 employees who was advised they had tested positive that day.

    g.    Defendant then instructed Ms. Lowery to wait with a group of other employees whose urine samples also had tested positive for certain chemicals. Employees whose urine had tested negative for any of the chemicals for which Defendant was testing were instructed by Defendant to return to their work stations. Every employee in Defendant's factory thus was made aware of which employees had tested positive and which had tested negative.

    h.    Defendant met privately with Ms. Lowery and asked her what medications she was taking and for what medical conditions she was taking them. Defendant then sent her home.

    i.    Defendant placed her on paid leave of absence until May 11. Defendant instructed Ms. Lowery to report to work on May 11, and she worked each day from May 11 through May 22 without any complaints from Defendant about how she performed

her job duties.

j.     Defendant instructed Ms. Lowery to bring her medications to its drug testing contractor along with proof that they had been prescribed for her. Ms. Lowery brought all of her prescription medications and proof that she had a prescription for each of them to Defendant's drug testing contractor. After seeing the proof that Ms. Lowery had prescriptions for her medications, the drug testing contractor reported to Defendant that the results of Ms. Lowery's drug test were negative.

k.     Despite receiving a report that the result of Ms. Lowery's drug test was negative, and despite what Defendant had told Ms. Lowery in the training she had attended that Defendant intended to take no action against employees taking medications for which they had prescriptions, Defendant advised Ms. Lowery on May 22, 2007, that she would not be allowed to work any more until she stopped taking her prescription medications and tested negative on another drug screen. Defendant so advised Ms. Lowery without doing an individualized assessment of the effect of her medications upon her ability to perform her job duties.

l.     Ms. Lowery attempted to stop taking her medications, but experienced excruciating pain when she did so. She thus was not able to stop taking her prescription medications, and Defendant never allowed her to return to work.

m.     Defendant terminated Ms. Lowery's employment on December 30, 2007.

n.     Defendant's medical examination, medical inquiries, disclosure of the results of the medical examination to Ms. Lowery's co-workers and subordinates, and use of the information obtained from the examination and inquiries to suspend Ms. Lowery and condition her return to work upon her ceasing to take her prescription

12

medication caused Ms. Lowery severe mental and emotional injuries and financial losses, including lost income.

    o.     The effect of the practices complained of in paragraphs 13a-n above has been to deprive Susan Lowery of equal employment opportunities and to otherwise adversely affect her status as an employee in violation of the ADA.

    14.     The unlawful employment practices included subjecting Branson Walker to medical examinations and inquiries that violated the ADA, failing to maintain confidentiality of information Defendant obtained from the medical examinations, and using the information obtained from these medical examinations and inquiries in a manner not in accordance with the ADA.

    a.     Mr. Walker became employed with Defendant as a production worker in March, 1999.

    b.     During his employment with Defendant, Mr. Walker developed certain medical conditions for which he was prescribed certain medications by his treating physician.

    c.     On or about May 7, 2007, Mr. Walker arrived at work and was required by Defendant to submit to a drug test as described in ¶ 11d. above despite Defendant's having no cause to believe that drug use was adversely affecting Mr. Walker's job performance.

    d.     Mr. Walker followed Defendant's instructions to report to a common area where numerous other employees were waiting to be tested and gave a urine sample to a nurse who was conducting the drug testing.

    e.     Mr. Walker waited in the common area with numerous other employees

13

until the test was complete. The nurse who tested Mr. Walker publicly announced in front of all employees in the area that Mr. Walker's urine sample had tested positive for the presence of certain chemicals.

f.      Defendant then instructed Mr. Walker to go to a smaller room nearby and wait with a group of other employees whose urine samples also had tested positive for certain chemicals. Employees whose urine had tested negative for any of the chemicals for which Defendant was testing were instructed by Defendant to return to their work stations. Every employee in Defendant's factory thus was made aware of which employees had tested positive and which had tested negative.

g.      Defendant met privately with Mr. Walker and asked him what medications he was taking and for what medical conditions he was taking each of them. Defendant then sent him home and told him to bring his medications to its drug testing contractor with proof that they had been prescribed for him.

h.      The following day, Mr. Walker brought his prescription medications and proof that he had a prescription for each of them to Defendant's drug testing contractor. After seeing the proof that Mr. Walker had prescriptions for these medications, Defendant's drug testing contractor reported to Defendant that the results of Mr. Walker's drug test were negative.

i.      Despite the report of a negative result on Mr. Walker's drug test, Defendant did not immediately allow him to return him to work. Defendant placed him on paid leave of absence from May 7 through May 18, then changed him to an unpaid leave of absence effective May 21, 2007.

j.      Defendant advised Mr. Walker that he would have to stop taking his

14

medications and test negative on another drug screen to return to work. Mr. Walker provided Defendant with a note from his doctor stating the dosages he was taking were too small for the medications to pose a safety risk, but Defendant nonetheless refused to allow him to return to work until he stopped taking them. Defendant did not conduct an individualized assessment of the effect of Mr. Walker's medications upon his ability to perform his job duties.

     k.     Mr. Walker stopped taking his prescription medications and, on May 29, 2007, tested negative on a drug screen. Defendant allowed him to return to work at that time. Without being able to take his prescription medications, however, Mr. Walker experienced excruciating pain while working for Defendant. He was forced to quit his employment when Defendant instituted extensive mandatory overtime for Mr. Walker's department that he was not able to work without being able to take his medications.

     l.     Defendant's medical examination, medical inquiries, disclosure of the results of the medical examination to Mr. Walker's co-workers, and use of the information obtained from the examination and inquiries to suspend Mr. Walker and condition his return to work upon his ceasing to take his prescription medications caused Mr. Walker severe mental and emotional injuries and financial losses, including lost income.

     m.     The effect of the practices complained of in paragraphs 14a-l above has been to deprive Branson of equal employment opportunities and to otherwise adversely affect his status as an employee in violation of the ADA.

     15.     The unlawful employment practices included subjecting Edie Cox to medical examinations and inquiries that violated the ADA and using the information

15

obtained from these medical examinations and inquiries in a manner not in accordance with the ADA.

a. Ms. Cox became employed with Defendant as a production worker in August, 1995.

b. During her employment with Defendant, Ms. Cox developed certain medical conditions for which she was prescribed certain medications by her treating physicians.

c. On or about May 7, 2007, Ms. Cox was on a medical leave of absence when Defendant called her and told her to go to the facility of its drug testing contractor to submit a urine sample for a drug test.

d. Ms. Cox followed Defendant's instructions and went to Defendant's drug testing contractor and gave a urine sample to one of the nurses there.

e. The nurse advised Ms. Cox that she had tested positive for certain chemicals. Ms. Cox provided Defendant's drug testing contractor with proof that she had prescriptions for the medications for which she had tested positive. The contractor then reported to Defendant that the result of Ms. Cox's drug test was negative.

f. Defendant left Ms. Cox on medical leave of absence. Despite the negative result reported by its drug testing contractor, however, Defendant told Ms. Cox that she had to stop taking her medications and test negative on another drug screen before she could return to work. Defendant did not conduct an individual assessment of the effect of Ms. Cox's medications upon her ability to perform her job duties

g. Ms. Cox attempted to stop taking her medications, but experienced severe medical symptoms when she did so.

16

h. Ms. Cox realized that she was not able to stop taking her prescription medications, and Defendant never allowed her to return to work.

i. Defendant terminated Ms. Cox's employment in September, 2007.

l. Defendant's medical examination, medical inquiries, and use of the information obtained from the examination and inquiries to condition Ms. Cox's return to work upon her ceasing to take her prescription medications all violate the ADA and caused Ms. Cox severe mental and emotional injuries and financial losses, including lost income.

m. The effect of the practices complained of in paragraphs 15a-l above has been to deprive Edie Cox of equal employment opportunities and to otherwise adversely affect her status as an employee in violation of the ADA.

16. The unlawful employment practices included subjecting Charlene Rawdon to medical examinations and inquiries that violated the ADA, failing to maintain confidentiality of information Defendant obtained from the medical examinations, and using the information obtained from these medical examinations and inquiries in a manner not in accordance with the ADA.

a. Ms. Rawdon became employed with Defendant as a production worker in October, 1986.

b. During her employment with Defendant, Ms. Rawdon developed certain medical conditions for which she was prescribed certain medications by her treating physicians.

c. On or about May 7, 2007, Ms. Rawdon arrived at work and was required by Defendant to submit to a drug test as described in ¶ 11d. above despite Defendant's

17

having no cause to suspect that use of drugs was adversely affecting Ms. Rawdon's job performance.

d.    Ms. Rawdon followed Defendant's instructions to report to a common area where numerous other employees were waiting to be tested and gave a urine sample to a nurse who was conducting drug testing for Defendant.

e.    Ms. Rawdon waited in the common area with numerous other employees until the test was complete. The nurse who tested Ms. Rawdon publicly announced in front of all employees in the area that Ms. Rawdon's urine sample had tested positive for the presence of certain chemicals. Ms. Rawdon was one of approximately 30 employees who was advised they had tested positive that day.

f.    Defendant then escorted Ms. Rawdon into the work area to retrieve her things and then off of Defendant's property. Employees whose urine had tested negative for any of the chemicals for which Defendant was testing were instructed by Defendant to return to their work stations. Every employee in Defendant's factory thus was made aware that Ms. Rawdon had tested positive for a substance in the drug test.

g.    As Defendant's managers escorted Ms. Rawdon off of its premises, they asked her what medications she was taking and for what medical conditions she was taking them. They told her to bring her medications to its drug testing contractor along with proof that they had been prescribed for her.

h.    The following day, Ms. Rawdon brought her prescription medications and proof that she had a prescription for each of them to Defendant's drug testing contractor. After seeing the proof that Ms. Rawdon had prescriptions for her medications, the drug testing contractor reported to Defendant that the results of Ms.

18

Rawdon's drug test were negative.

i.      Despite receiving a report that the result of Ms. Rawdon's drug test was negative, Defendant did not immediately allow Ms. Rawdon to return to work. Defendant required her to bring her medications to its facility and show them to its own managers and describe the medical conditions for which she was taking them. Defendant placed Ms. Rawdon on a paid medical leave of absence until May 18, 2007. then placed her on an unpaid medical leave of absence effective May 21, 2007.

j.      Defendant advised Ms. Rawdon that she would have to test negative on another drug screen in order to return to work.

k.      On June 4, Ms. Rawdon tested negative and was allowed to return to work. Without the benefit of her prescription medications, Ms. Rawdon experienced excruciating pain while performing her job duties.

l.      Defendant's medical examination, medical inquiries, disclosure of the results of the medical examination to Ms. Rawdon's co-workers, and use of the information obtained from the examination and inquiries to suspend Ms. Rawdon and condition her return to work upon her ceasing to take her prescription medication caused Ms. Rawdon severe mental and emotional injuries and financial losses, including lost income.

m.      The effect of the practices complained of in paragraphs 16a-l above has been to deprive Charlene Rawdon of equal employment opportunities and to otherwise adversely affect her status as an employee in violation of the ADA.

17.      During the same relevant time period, Defendant also subjected a class of current and other former employees to drug testing, including medical examinations,

19

inquiries that violated the ADA, failed to maintain confidentiality of information Defendant obtained from the medical examinations, and using the information obtained from these medical examinations and inquiries in a manner not in accordance with the ADA.

18.     The effect of the practices complained of in paragraphs 17 above has been to deprive a class of current and former employees of equal employment opportunities and to otherwise adversely affect their status as an employee in violation of the ADA.

19.     The unlawful employment practices complained of in paragraphs 9 through 18 above were and are intentional.

20.     The unlawful employment practices complained of in paragraphs 9 through 18 above were and are done with malice or with reckless indifference to the federally protected rights of Defendant's employees, including but not limited to those specifically named above.

## PRAYER FOR RELIEF

Wherefore, the Commission respectfully requests that this Court:

A.     Grant a permanent injunction enjoining Defendant Employer, its officers, successors, assigns, and all persons in active concert or participation with it, from conducting drug tests for legally prescribed medications, making inquiries of its employees about what medications they are taking and/or the conditions for which they are taking them, taking adverse actions against employees for taking legally prescribed medications without conducting individualized assessments of the effects of those medications upon the employees' performance of their job duties, or disclosing medical

20

information about Defendant's employees.

    B.     Order Defendant Employer to institute and carry out policies, practices, and programs which provide protection against conducting drug tests for legally prescribed medications, making inquiries of its employees about what medications they are taking and/or the conditions for which they are taking them, taking adverse actions against employees for taking legally prescribed medications without conducting individualized assessments of the effects of those medications upon the employees' performance of their job duties, or disclosing medical information about Defendant's employees, and which eradicate the effects of Defendant's past and present unlawful employment practices.

    C.     Order Defendant Employer to make whole all employees adversely affected by Defendant's illegal actions described above, including but not limited to Annie Corbin, Johnny Gardner, Susan Lowery, Edie Cox, Branson Walker, and Charlene Rawdon, by providing appropriate backpay and compensatory damages for their other pecuniary losses with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices.

    D.     Order Defendant Employer to make whole all employees adversely affected by Defendant's illegal actions described above, including but not limited to Annie Corbin, Johnny Gardner, Susan Lowery, Edie Cox, Branson Walker, and Charlene Rawdon, by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of in paragraphs 9 – 18 above, including emotional pain, suffering, inconvenience, humiliation, and loss of enjoyment of

21

life, in amounts to be determined at trial.

E.     Order Defendant Employer to pay all employees adversely affected by Defendant's illegal actions described above, including but not limited to Annie Corbin, Johnny Gardner, Susan Lowery, Edie Cox, Branson Walker, and Charlene Rawdon, punitive damages for its malicious and reckless conduct described in paragraphs 9 - 15 above, in amounts to be determined at trial.

F.     Grant such further relief as the Court deems necessary and proper in the public interest.

G.     Award the Commission its costs of this action.

22

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by its

Complaint.

**JAMES LEE**
Deputy General Counsel

**GWENDOLYN YOUNG REAMS**
Associate General Counsel

**FAYE A. WILLIAMS**
Regional Attorney
Tennessee Bar No. 011730

**DEIDRE SMITH**
Supervisory Trial Attorney
Tennessee Bar No. 018499

**STEVEN W. DILLS**
Senior Trial Attorney
Tennessee Bar No 11970

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
1407 Union Avenue, 9th Floor
Memphis, TN 38104
Telephone: (901) 544-0136

**SALLY RAMSEY**
Senior Trial Attorney
TN Bar No. 18859

**MARK CHEN**
Trial Attorney
TN Bar No. 014268

23

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
50 Vantage Way, Suite 202
Nashville, TN 37228
Telephone:   (615) 736-2105

24